YELLOW MANUFACTURING ACCEPTANCE CORPORATION, A CORPORATION, APPELLANT, v. HARRY O. ROGERS AND IRA O. SCHOOLER, ADMINISTRATOR OF THE ESTATE OF MILO SCHOOLER, DECEASED, RESPONDENTS.—142 S. W. (2d) 888.

Springfield Court of Appeals. August 22, 1940.

*Dean C. Allard, Roy Coyne, Emerson Foulke* and *Galt & Smith* for appellant.

*Birkhead & Teters* for respondents.

TATLOW, P. J.—This is an action in replevin under a chattel mortgage executed and recorded in Oklahoma where the mortgagor resided. The mortgagor was V. F. Weaver. The mortgagee was the Forester Clark Truck Co., and the Yellow Manufacturing Acceptance Corporation, the plaintiff below (appellant here) is the assignee of the mortgagee. The defendants below (respondents here) are Harry O. Rogers and Ira O. Schooler, administrator of the estate of Milo Schooler, deceased.

The deceased was killed in Jasper County, Missouri, by the truck of which V. F. Weaver was the mortgagor; at the time of the acci-

dent the truck was in the mortgagor's possession and was driven by one, Marvin Cross. The appellant asserts title under the Oklahoma mortgage. Respondents assert title under an attachment suit against the said V. F. Weaver and Marvin Cross, (who are not parties to this suit) commenced in the Circuit Court of Jasper County, Missouri and under a writ of attachment issued therein the truck in controversy was levied upon.

The dates are as follows: The date of the mortgage is November 25, 1938. It was duly filed in Oklahoma on the 26th day of November, 1938. It provided for installment payments. All installments were paid up to February 2, 1939. The next installment would not be due until March 2, 1939. The accident and death occurred on February 27, 1939. The attachment suit was filed and the truck levied upon, on February 28, 1939. The replevin suit was filed on March 22, 1939.

The mortgage was never filed in Missouri and if it has any validity under the laws of this State it is under the doctrine of comity. Hence, the controlling question in the case is with reference to the validity of the mortgage in Missouri. If the mortgage is valid, a further question arises as to whether there was any default in the mortgage so as to entitle the appellant to maintain this replevin suit. If the mortgage is invalid, then a further question arises as to whether there was any evidence of the value of the truck at the time the judgment was rendered, so as to authorize the court to render a judgment in favor of the respondents for possession of the truck or at their election a judgment against the plaintiff and its surety on the replevin bond, in the sum of $1200.

The activities of V. F. Weaver, the mortgagor, are shown by the testimony of Arthur Thomas, who represented the appellant, as follows:

". . . Mr. Weaver used the truck for general hauling, I think, grain and feed and some posts. At the time he was last contacted he was hauling hay, I think, from around Enid over to Choteau and possibly Siloam Springs, Arkansas, and points in the eastern part of Oklahoma. I know he hauled some to Westville. At the time the truck was attached, as I understand it, he was hauling up here in Missouri, somewhere. Prior to the levy of the attachment of the truck in this county, I don't know as Weaver told me where he was hauling grain and hay and other products from. I suppose my recollection is as good now as it was on February 28, 1939. I came to the office of Teters and Birkhead in Carthage on February 28, 1939, shortly before noon and had a conversation with you (Birkhead) and Mr. Teters about this truck that the sheriff had attached that day. I told you that I was a representative of the Yellow Mfg. Acceptance Corporation and represented the company in matters of business pertaining to the note or chattel mortgage acquired from Forster-Clark Truck

Company of Tulsa shortly after the note was executed by Mr. Weaver. I told you on that occasion that the balance of the note was $1067. I don't recall telling you that the truck originally sold for thirteen or fourteen hundred dollars but that would have been right. I said Weaver's home was in Choteau, Oklahoma. I discussed Weaver's financial standing and told you Weaver's father had lost a farm. I said that this was a one and one-half ton truck, 1939 model with a long wheel base and box on the truck.

"Q. Now, do you remember that at that time you told Mr. Teters and I that Mr. Weaver, the mortgagor, had been hauling feed and grain from points in Missouri and Oklahoma? A. Well, I had just received that information when I was on this trip into Missouri, he was hauling from Missouri; that is how I knew he was hauling from Missouri, when I found the truck down here attached; I was called about the wreck.

"Q. You mean to say that is the first time you acquired information he was hauling from points in Missouri? A. That is the first definite information—

"Q. What other information did you have? A. Well, I say, that is the first definite information.

"Q. What do you mean by definite information? A. That I had actually been told that he was hauling in Missouri.

"Q. When had you been told he was hauling with his truck in Missouri? A. Well, the evidence of the truck being here.

"Q. When prior to that time had you been told that Mr. Weaver was hauling with his truck in Missouri? A. I don't recall.

"Q. You don't have any recollection about that? A. No, sir.

"Q. Would you say that you had not been told that? A. No, I wouldn't say that, but I don't recall it.

"Q. You wouldn't say you didn't have knowledge and information prior to the attachment that Mr. Weaver was using this truck to haul products from Missouri, and points in the State of Missouri? A. No, I wouldn't say that.

"I don't recall telling you I saw Weaver at Siloam Springs about a month before our conversation, it is possible I did. I have seen Mr. Weaver in Siloam Springs because it is in my territory and I have other accounts there but I could not say I saw him there about a month prior to the attachment. I have a pretty good memory. I can't say that I did talk to Weaver at Siloam Springs prior to the attachment and I can't say I did not talk to him. I don't recall telling Mr. Teters and you that I had seen and talked to Weaver at Siloam Springs about a month prior to the attachment and that Weaver told me that he was then on his way and coming into Missouri for a load. I don't recall any conversation regarding it. I did not know, definitely of the fact that Weaver was bringing this truck into the State of Missouri, that is, I didn't see the truck hauling and he did not tell me

definitely himself. I wouldn't say he did tell me and I do not know that he did not tell me. We did not have notice or knowledge that the truck was being taken from the State of Oklahoma. I did not have knowledge or information from the owner of the truck or from anybody else that I know of. I was called by our dealer who said the truck had been wrecked in Carthage, Missouri.''

In respondents' additional abstract is set out the cross examination of the witness Thomas, with questions and answers. The testimony seems to be correctly abstracted by appellant.

Mr. Birkhead testified with reference to the conversation of the witness Thomas, as follows:

''. . . Mr. Thomas stated to me and in Mr. Teters' presence that Mr. Weaver had been using this truck for about thirty days in hauling grain and hay products from Missouri to other points in Oklahoma and elsewhere. I asked him more particularly about his knowledge and information concerning that situation and I asked him to tell me what conversation he had with Mr. Weaver. He said that about a month ago, that is, a month prior to February 28th, he saw Weaver at Siloam Springs, Arkansas, and Weaver told him he was then on his way with this truck covered by the mortgage to the State of Missouri, to get a load. He stated that was all the conversation that he had and the information he obtained from Mr. Weaver at that time pertaining to this particular trip. He also stated that Mr. Weaver had been coming into Missouri with this truck for about thirty days and that he had this information that Weaver had been coming into Missouri with his truck for about thirty days. I asked him particular questions concerning that. Mr. Thomas left his card, he said, in case we wanted to correspond with him about this matter. Immediately after the conversation and after Mr. Thomas left, I dictated a memoranda of the conversation I had with Mr. Thomas which I have been referring to to refresh my memory during this testimony.

''Cross Examination.

''I did not ask Thomas where Mr. Weaver had been hauling from in Missouri, because I did not deem it necessary. I did not ask him how many trips Weaver had made. Thomas said Weaver had been making trips, he put it in the plural, I will say that. I did not ask him whether Weaver had moved to Missouri. I had information Weaver did not live in Missouri, the attachment was on the ground he was a non-resident. I did not advise Mr. Thomas that anything he might say could be used against him. I tried to get all the information I could pertaining to this matter.''

This was all of the evidence with reference to the use of the truck in Missouri.

It will be observed that the number of trips is not shown. Neither is it shown that, on the occasion of the accident, when the truck left

Oklahoma there was any definite fixed place in Missouri where the driver intended to purchase grain. All that can be inferred is that he intended to purchase grain wherever he could find it at a satisfactory price. There is nothing to show that he had in mind any particular place or county where he expected to procure the grain. The record does not show whether he had procured the grain and was headed back to Oklahoma when the accident occurred, or, if he had purchased the grain, whether he purchased it in Jasper County or some other county.

The time required to purchase and load the grain is not shown. It probably would take but little more time to purchase and load the grain than it would to have the truck serviced by purchasing gas and oil at a filling station. There is no evidence to show that the truck was ever at any time at any particular place in Missouri long enough to establish even a *temporary situs*, or to be situated there for a sufficient length of time to enable the mortgagee to file the mortgage. In other words, so far as the evidence shows, the truck was used on at least two occasions on a continuous trip from Oklahoma to Missouri and back again for the sole purpose of purchasing and conveying grain or some other commodity back to Oklahoma, which was the only *situs* or location that the truck ever had in Missouri.

There is no substantial evidence that the truck was being used as a business in purchasing and conveying grain or other commodities from Missouri to Oklahoma, and using the roads of Missouri for that purpose. The most that can possibly be inferred is that the truck was used for that purpose on at least two occasions. So far as the evidence shows, it was merely a temporary use of the truck in and out of Missouri on at least two occasions.

The Missouri statute requiring the recordation of a mortgage (Sec. 3097, R. S. 1929) provides:

". . . and recorded in the county in which the mortgagor or grantor resides, in such manner as conveyances of land are by law directed to be acknowledged or proved and recorded, or unless the mortgage or deed of trust, or a true copy thereof, shall be filed in the office of the recorder of deeds of the county where the mortgagor or grantor executing the same resides, and in the case of the city of St. Louis, with the recorder of deeds for said city, or, where such grantor is a nonresident of the State, then in the office of the recorder of deeds of the county or city where the property mortgaged was situated at the time of executing such mortgage or deed of trust; and such recorder shall indorse on such instrument or copy the time of receiving the same, . . ."

The Missouri statute, if read literally and construed strictly, does not cover the situation that we have here. In order for it to cover this transaction the truck would have to have been situated in Missouri at the time the mortgage was executed. Under a literal construction of

the statute there was no place in this State where the mortgage could have been recorded so as to give constructive notice.

Giving a liberal construction to the statute and construing the phrase "at the time of executing such mortgage," as intended to require the immediate filing of the mortgage, or the filing of the mortgage within a reasonable time after it could be filed, then, if the truck was ever "situated" in Missouri, it would be a compliance with the statute to file the mortgage in the county where the property was "situated" at the time of filing same. This would be a substantial compliance with the statute, but the fact still remains that the property must be *"situated"* in Missouri.

Webster's Dictionary defines the word "situated" as follows:

"Having a site, situation, or location; being in a relative position; permanently fixed; located; as, a town *situated* on a hill."

Bouvier's Law Dictionary defines *"situs"* as a situation or location.

5 Words and Phrases, 5th Series, p. 371, defines "situated" as follows:

" 'Situated,' as used in statute providing that taxable property shall be assessed in place in which it is 'situated,' connotes a more or less permanent location or *situs,* and the requirement of permanency must attach before tangible personalty which has been removed from the domicile of the owner will attain a *situs* elsewhere. [Pol. Code, sec. 3628; Brock & Co. v. Board of Sup'rs of Los Angeles County, 65 Pac. (2d) 791, 793, 8 Cal. (2d) 286, 110 A. L. R. 700.]"

Hence, according to the above definitions "situation" and *"situs"* are synonymous so that the word "situated" clearly implies some element of permanency, as does the word "removed" in the statutes providing for the recording of a mortgage when property is removed from one State to another.

The Missouri statute either does not make any provision requiring the recording of a mortgage where the property is removed from some other State to this State, or, if it is applicable, it only requires the filing of the mortgage when the property has a *situs,* or is *situated* in Missouri.

So far as we have been able to ascertain there is no Missouri decision dealing directly with the question concerning the mere temporary use of a truck in and out of this State. There are several cases from other States cited and relied upon by the appellant where this identical question has received the consideration of the courts. [P. R. Smith Motor Sales, Inc., v. Lay (Va.), 3 S. E. (2d) 190; Flora v. Julesburg Motor Co. (Colo.), 193 Pac. 545; Bankers' Finance Corp. v. Loche & Massey Motor Co. (Tenn.), 91 S. W. (2d) 297.]

In the Virginia case, *supra,* is the following:

" 'Removal' connotes something more than a mere change of location; some re-establishment is suggested. . . . We have held that a car *in transit* in Virginia has not been 'removed into this State.'

. . . Surely a merchant in Bristol, Virginia, who drove over to Bristol, Tennessee, to collect a bill would not have removed his car into Tennessee—a removal contemplates some change of *situs*.''

The term ''situated'' used in the Missouri statute, connotes something more than a mere change of location, just as does the word ''removed.'' Property cannot be situated at a place without having a *situs* at that place; hence, the instant case cannot be distinguished from the Virginia case.

In the Colorado case the court says:

''We do not decide whether the evidence is sufficient to show knowledge or consent on the part of Flora, nor whether, if there had been, with or without his consent, a removal of the truck to Colorado, the mortgage would have been good or bad, but we are of the opinion that driving the truck from time to time across the State line to Julesburg was not a removal in the sense in which that word is used in the cases on this subject. . . . It is so manifestly unjust that the mere crossing the State line in the ordinary use of the mortgaged chattel should subject the mortgage lien to other claims unless the mortgagee shall record the mortgage in every county in every State where the mortgagor is likely to go, that we are clear that comity requires us to hold that, under such circumstances, the mortgage lien remains superior to those afterwards acquired in this State. It does less hardship to require a lienor to inquire where the lienee lives than to foresee where he will take the chattel.''

In the Tennessee case, Bankers' Finance Corp. v. Locke & Massey Motor Co., 91 S. W. (2d) 297, the court said:

''The rule in this State, therefore, now is that the priority of a chattle mortgage validly executed and legally registered in another State, according to the laws of that State, wherein the property was and the mortgagor resided, will be recognized and enforced in this State against the claims of attaching creditors or innocent purchasers here, unless the mortgagee has consented to the *removal* of the property into this State, or having knowledge of its removal here, has failed to assert rights under the mortgage within a reasonable time. We italicize the word 'removal.' While the point is not stressed in our opinion cited, it is clearly implied, and properly, that the removal referred to is one of a permanent, rather than a merely temporary, or transient, nature. . . . We are not justified upon authority or reason, if the doctrine of comity is to be enforced, as well as recognized, in denying to this mortgagee priority.''

We do not think that ''the driving the truck from time to time across the State line'' was either a removal of the truck from Oklahoma to Missouri, or gave the truck a *situs* in Missouri, or made it *situated* in Missouri so as to require the filing of the mortgage in Missouri. The fact is that, so far as the evidence in this case shows, in order for the mortgagee to have filed his mortgage in Missouri, he would either have

had to go with or ahead of the truck and file the mortgage in each county through which it passed. Such a construction would be entirely unreasonable. Furthermore, the filing of the mortgage under such circumstances would not constitute notice unless the truck was, within the meaning of the statute, "situated" in the county at the time of the filing. [Reynolds v. Smith, 100 S. W. 535.] Neither do we think that the cases *supra* can be distinguished on the ground that the statutes in those cases used the word "removed," whereas the Missouri statute uses the word "situated." If there is any difference or distinction between the terms, the Missouri statute requiring the property to be "situated" in Missouri is stronger than the statutes requiring the mortgage to be filed when the property is "removed" to the State. The removal would have to precede the property to this State before it could be "situated" in this State. The general rule relating to the law of comity is very clearly and accurately stated in 11 Am. Juris. Title "Conflict of Laws," pages 296, 297, as follows:

"Par. 4. *Generally.*—No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one State or nation is allowed to operate within the dominion of another depends on what is commonly called 'the comity of nations.' Comity, in the legal sense, is neither a matter of absolute obligation on the one hand nor of mere courtesy and good will upon the other. It has been defined as the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protection of its laws. It is also stated to be the doctrine under which contracts made, rights acquired, and obligations incurred in one country, in accordance with its laws, are recognized and enforced by the courts of another country."

From which it will be seen that it is neither a matter of absolute *obligation or mere courtesy or good will*, but is the doctrine under which contracts made, rights acquired, and obligations incurred in one State are enforced by the courts of another State unless there is some *definite public policy preventing the recognition of such right or title*. As we understand the respondents in the instant case, their contention is that the Missouri decisions fix a definite public policy that the mortgage executed on the truck in Oklahoma, in compliance with the laws of Oklahoma, is invalid if the mortgagee *knew* that the truck was to be used on as much as two occasions to come to Missouri to purchase grain and return to Oklahoma therewith, in time to have filed its mortgage somewhere in this State. This too though there is no evidence to show that the mortgagee knew where the mortgagor was going to buy the grain or that the mortgagor could have informed the mortgagee in which county he expected to buy it so that the mortgage could have been filed in such county. The Missouri authorities

relied upon to establish this contention are Geiser Manufacturing Company v. Todd, 204 S. W. 287, 289; Adamson v. Fogelstrom, 221 Mo. App. 1243, 300 S. W. 841; Hollipeter, Shonyo & Co. v. Maxwell, 205 Mo. App. 357, 224 S. W. 113. We do not think that these cases establish such a rule.

There is certainly no similarity in the facts in the case of Geiser Manufacturing Company v. Todd, *supra*, to sustain this contention. In that case there was a finding of facts, copied in 204 S. W. 288, 289, which very clearly shows that the *situs* of the property was permanently removed from Arkansas to Missouri, with the consent of the mortgagee.

The court further says in that case:

". . . The mortgagee could refuse consent to move the property, or, if he consents, he could record his mortgage in the other jurisdiction. This seems to square with substantial justice, and we think is the general rule. [Citing numerous authorities.]" [204 S. W. l. c. 289.]

The Todd case certainly does not support the contention of the respondents in the instant case. This is also true as to the case of Adamson v. Fogelstrom, 300 S. W. 841. In that case the facts clearly showed that there had been an actual change of the *situs* of the sheep from Kansas to Missouri, with the actual agreement and consent of the mortgagee, and with sufficient time elapsing to have enabled the mortgagee to file its mortgage in Jackson County, where the sheep were then actually situated. In that case it is said:

"It is contended that the mortgagee's consent to the removal of the sheep from Kansas, the *situs* of the mortgage, did not waive the lien." [300 S. W. l. c. 844.]

Observe that in that case the mortgagee consented to the removal of the sheep from Kansas to Missouri so as to completely change the *situs* of the sheep. The consent related not only to the transfer of the sheep from Kansas to Missouri but the change of the *situs* so that the sheep would actually be situated in Missouri for at least a sufficient length of time to enable them to be sold on the market. The time that elapsed was sufficient to have enabled the mortgagee to file its mortgage.

Thus is also true with reference to the case of Hollipeter, etc., Co., v. Maxwell, *supra*. The facts there show that Dunbar, the mortgagor whose home was at Burdette, in Mississippi County, Arkansas, *removed* the mortgaged property in November, 1918, to Fowler's garage in Pemiscot County, Missouri, to have the car repaired. It remained there until May, 1929, when Block & Davis, who repaired the car, recovered a judgment on personal service in the Justice Court against Dunbar, for the repairs, which was declared to be a lien on the car, and execution was issued thereon and the car sold. The controversy was between the mortgagee in the Arkansas mortgage, which had never been recorded in Missouri, and the purchaser under the judgment.

The further facts are as recited by the court:

"Plaintiff did not·know that the car was in Missouri until the early spring of 1919. When plaintiff found out that the car was at Cooter, Mo., in a garage, with a repair bill against it, its vice-president sent for Dunbar, who came in. The vice-president then gave Dunbar $58 in money to pay the repair bill, and directed him to get the car and return it to Arkansas, and then dismissed the matter from his mind, he says. A few months later this witness, the vice-president, learned that Dunbar had paid nothing on the repair bill, had not returned the car to Arkansas, and that the car was about to be sold in Missouri for the repair bill. This witness then went up in Missouri a day· or so before the sale, but no agreement could be reached, and nothing was done towards paying the repair bill, and the car was sold as stated. July 19, 1919, plaintiff brought this suit to recover the automobile." [224 S. W. l. c. 114.]

Concerning this state of facts the court said (after citing authorities, including the Todd case) :

". . . We are satisfied with our statement of the law there, and adhere to it. If, therefore, plaintiff knew that this car was brought to Missouri, or consented that it be brought here, or after it was brought here plaintiff acquiesced therein, and took no steps to follow the property into this jurisdiction and file or record his lien here, and permitted the rights of innocent third persons in this State to attach, it ought not to recover." [224 S. W., l. c. 114, 115.]

Observe that in that case the car was actually situated in Missouri and had been from November, 1918, to July 19, 1919. It was brought to Missouri for the express purpose of having it repaired, which would, and did, permit the rights of innocent third persons in this State to attach thereto. It had an actual *situs* in Missouri and was, in fact, situated in Missouri, and the mortgagee had actual knowledge of this fact a sufficient length of time before the work was done on the car, on February 20, 1939, to have enabled him to file his mortgage and recover possession of the car before the repair work was done.

None of these cases deals with the mere driving of a truck from time to time across the State line into Missouri, with notice thereof on the part of the mortgagee, as do the Virginia, Colorado, and Tennessee cases *supra*. The Missouri cases purport to follow the majority rule as shown by the encyclopaedias and authorities from other States dealing with the question. They are undoubtedly correctly decided on the facts in the respective cases, but do not sustain the contention of the respondents in this case, that the Oklahoma mortgage is invalid under the facts presented by this record.

The mortgagor, in driving the truck in and out of Missouri, was exercising a lawful right.

". . . a State may not withhold from nonresident individuals the right of doing business therein. The privileges and immunities clause of the Constitution, par. 2, art. 4, safeguards to the citizens of one

State the right 'to pass through, or to reside in any other State for purposes of trade, agriculture, professional pursuits, or otherwise.' " [Hess v. Pawloski, 274 U. S. 352, l. c. 355; 71 L. Ed. 1091, l. c. 1094.]

That was an automobile case, in which the court further said:

"Motor vehicles are dangerous machines; and, even when skillfully and carefully operated, their use is attended by serious dangers to persons and property. In the public interest the State may make and enforce regulations reasonably calculated to promote care on the part of all, residents and nonresidents alike, who use its highways. . . ." [274 U. S. 352, l. c. 356; 71 L. Ed. 1091, l. c. 1094.]

If public policy requires that the mortgage on a car that is driven into and out of the State of Missouri should be invalid as against a citizen of Missouri who is injured by such car so driven over the State highways, such public policy should be expressed in a statute designating a place to file the mortgage, not depending on the fact that the car must be situated in Missouri, but it must be filed if the car is only *in transit,* so that nonresidents interested in such cars will be charged with knowledge of such law. It is not for the courts to change the law relating thereto, which law existed long before automobiles were in general use, by attempting to formulate a rule that disregards the Missouri statute which requires a nonresident's property to be "situated" in this State before requiring the filing of a mortgage thereon in the county where the property is *situated* in order to protect the mortgagee's rights. A court that determines a case solely by its own notions of its abstract justice breaks down the barriers by which rules of justice are erected into a system and thereby annihilates the law. To follow the dictates of justice when in harmony with the law is a pleasure; to follow the rules of law in their true spirit to whatever consequences they may lead is the plain duty of the court.

As very aptly said by the Supreme Court of Tennessee in the case of Bankers' Finance Corp., *supra:*

". . . We are not justified upon authority or reason, if the doctrine of comity is to be enforced, as well as recognized, in denying to this mortgagee priority."

We could not do so in the face of Green v. Powell (Mo. App.), 46 S. W. (2d) 915, which is a decision of the St. Louis Court of Appeals, in which it is directly held that the recording act is not intended to and does not protect one who has an action only for a tort.

The reasoning of that case is somewhat in conflict with the last paragraph of the Adamson case *supra* (300 S. W., l. c. 845), which was by the Kansas City Court of Appeals. It is not necessary for us to resolve this apparent conflict as the Green case was a tort case and the Adamson case sounded in contract. In the Adamson case there was no possible doubt but what the sheep were situated in Missouri. It seems to us that the reasoning in the Green case has considerable potency in determining the meaning of our statute requiring the

property to be "situated" in this State. We could not hold the mortgage in the instant case invalid because not recorded in Missouri without being in direct conflict with the Green case, which would require us to certify the instant case to the Supreme Court. But, as we do not place our holding in this case primarily upon the Green case, we do not think we are in conflict with the Adamson case.

This brings us to the final question in this case, as to whether there was a default in appellant's mortgage. At the time of the accident, on February 27, 1939, and at the time of filing the attachment suit on February 28, 1939, there was no default in the payment of any installment required by the mortgage.

At the time that this replevin suit was filed, on March 22, 1939, there was a default in the payment of an installment due on March 2, 1939.

The mortgage also contained, among other things, the following provision:

"The Mortgagor will not . . . part with or surrender the possession of said goods or any part thereof, and will not suffer or allow any of said goods by any means or under any circumstances to pass out of the Mortgagor's possession . . ."

It further provides:

"In the event the Mortgagor defaults in making any payment at the respective times and in the manner herein specified, or in performing any term, condition or covenant herein provided to be performed by the Mortgagor, or a proceeding in bankruptcy or insolvency be instituted by or against the Mortgagor, or a receiver be appointed for the goods of the Mortgagor, or the Mortgagor makes an assignment for the benefit of creditors, or makes an attempt to sell, secure, convert or remove the goods, or any part thereof, or if the goods become subject to any levy by any officer or public official, or if any writ or distress warrant shall be levied on said goods, or if the Mortgagee shall at any time deem this Mortgage, said goods, said debt or said security unsafe or insecure, then and in any such event the entire unpaid balance of the purchase price of said goods and all further and additional amounts secured by this Mortgage, shall, at the election of the Mortgagee, become and be immediately due and payable without notice or demand to anyone, and this Mortgage may at the Mortgagee's option (notice of the exercise of which option is hereby expressly waived) be foreclosed by action or otherwise, and the Mortgagee is hereby authorized and empowered to enter any premises of the Mortgagor or other place where the said goods, or any part thereof, may be and take possession of the goods and remove the same without notice or demand and without legal procedure, said notice and demand, and also any right of action, trespass or damages being hereby expressly waived, . . ."

Under the above provision in the mortgage, even though there was no default in the payment of the installment that was to become due

on March 2, 1939, when the accident occurred, there was a default under the other provisions of the mortgage. [Barton v. Sitlington, 128 Mo. 164; l. c. 173, 30 S. W. 514.] In addition to this, such a default accelerated the maturity of the unpaid installments and made the entire mortgage debt due. Furthermore, under the Missouri decisions, even if there was no default at the time of the attachment, it was sufficient to entitle the plaintiff to maintain replevin that there was a default in the payment of the installment that became due on March 2, 1939, before this suit was filed on March 29, 1939. [Green v. Powell (Mo. App.), *supra*, 46 S. W. (2d) 915, l. c. 918; Halferty v. Karr, 188 Mo. App. 241, 175 S. W. 146, l. c. 148, and cases cited.]

We think this case should be and is reversed with directions to the trial court to enter a judgment for the appellant as the plaintiff in the replevin suit, and for its costs in this case, and the case is remanded to said court with such directions. *Smith* and *Fulbright, JJ.*, concur.